Argued January 25, affirmed April 1, petition for reconsideration
denied May 1, petition for review denied June 25, 1974

## STATE OF OREGON, *Respondent, v.*
## DANNY LONGORIA (No. C 73-02-0466 Cr),
### *Appellant.*
**520 P2d 912**

[ 1 ]

*Frank J. Susak,* Portland, argued the cause for appellant. With him on the brief was Susak and Lawrence, Portland.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FORT and TANZER, Judges.

TANZER, J.

The defendant was convicted after a jury trial of four counts of robbery in the first degree. ORS 164.415. He appeals, assigning several rulings as error.

■ First, he assigns the failure of the presiding judge to grant his motion for a continuance and of the trial judge to grant his renewed motion for a continuance.

The motion before the presiding judge was oral and conclusory. ORS 136.070① requires that a motion for continuance by the defendant be accompanied by an affidavit showing "sufficient cause" which shall be "first filed with the clerk." Since the ruling upon a motion for continuance is discretionary, there is nothing for an appellate court to review in the absence of such a showing. *State v. Brauhn,* 247 Or 430, 430 P2d 1012 (1967); *State v. Losey,* 3 Or App 612, 613-614, 475 P2d 430, *rev den* (1970); *State v. Young,* 1 Or App

---

① ORS 136.070 provides:

"When an indictment is at issue upon a question of fact and before the same is called for trial, the court may, upon sufficient cause shown by the affidavit of the defendant or the statement of the district attorney, direct the trial to be postponed for a reasonable period of time; and all affidavits or papers read on either side upon the application shall be first filed with the clerk."

562, 569, 463 P2d 374, *rev den* (1970). A belated motion and affidavit, also in conclusory terms, was filed 20 days after the four-day trial commenced in an apparent effort to make a record where none had before existed.

■ Compliance with ORS 136.070 by making a showing in writing is more than a formality to satisfy appellate courts. It is designed to provide a basis upon which a trial judge can make a discretionary ruling in an intelligent and informed manner. A motion and affidavit are to be made for purposes of obtaining a continuance, not for the perfection of an appeal. Therefore, compliance with ORS 136.070 must be prior to trial, and non-timely compliance must be regarded as no compliance at all.

■ We note in passing that there is no egregious error. The affidavit and the oral showing rest upon the absence of a hospitalized witness and of another witness who was in Hawaii. The hospitalized witness was one of the investigating detectives who was expected to remain hospitalized for seven or eight months. There is no indication of how a situation which would be expected to weaken the state's case would also be to the defendant's disadvantage at trial. There is no showing as to what the witness in Hawaii would have added to the defendant's case. Defense counsel asserts outside the record that she would have been an alibi witness, but the defense produced at least six alibi witnesses other than the absent witness. We cannot say that the failure to delay the trial to accommodate an additional alibi witness was an abuse of discretion.

The motion for continuance before the trial judge was based additionally upon the unexpected availability of John Costello as a witness, about which there

is additional discussion below. The court made adequate provisions for defendant's problems in this regard. We are satisfied that the trial court exercised its discretion properly.

The next assignment of error also deals with a belated attempt to make a record which was not made in a timely and accurate fashion. Defendant assigns the denial of a portion of his motion for new trial which asserts:

> "There was an irregularity in the proceedings of the Court in that the defense was allowed only six pre-emptory [sic] challenges when picking the jury, after having been told by the Court that there would be twelve challenges allowed in this case.
> * * *"

The motion is supported by counsel's affidavit which alleges:

> "On April 4, 1973, this trial began and during the selection of the jury, a mistrial was granted by the Honorable Richard Burke. Prior to picking that jury, Judge Burke indicated, in chambers, that the defense would have twelve challenges in this case, since it was such a serious case.
>
> "On April 5, 1973, a new jury was selected, and after six challenges Judge Burke ordered the jury sworn. At that time I made it known to Judge Burke that I was under the impression that the defense had twelve challenges and that I was not satisfied with the jury at that point. Judge Burke indicated that the Oregon Revised Statutes provide for six challenges in this type of criminal proceeding and that he had so indicated this prior to picking the second jury. I did not hear him so indicate."

There was no transcript made of the proceedings which the affidavit alleges were held in chambers. As far as we can tell, no reporter was present. This

court has before indicated its express disapproval of the conduct of any portion of a criminal proceeding off the record. *See,* e.g., *State v. Pflieger,* 15 Or App 383, 515 P2d 1348 (1973). A report should be available for transcription in the event that any portion of a criminal proceeding serves as the basis of an assignment of error. The lack of a transcript, however, does not require reversal.

■ The effect of a deficiency in the record upon an appeal must be determined in light of the statutory requirement that we presume official regularity in the circuit court proceedings. ORS 41.360 (15) ;[2] *State v. Spicer,* 3 Or App 120, 125, 473 P2d 147 (1970) ; *State v. Ellison,* 209 Or 672, 678-679, 307 P2d 1050 (1957) ; *cf. State v. Rohde,* 245 Or 593, 421 P2d 690, *cert den* 387 US 924, 87 S Ct 2043, 18 L Ed 2d 981 (1967).

■■ An appellate court does not rule upon abstract claims of error, but only upon specific rulings of the trial court. *State v. Baker,* 242 Or 207, 408 P2d 928 (1965). It is the responsibility of the aggrieved party to see that his claim of error is properly presented to the trial court for immediate resolution or cure. If dissatisfied, it is appellant's responsibility to see to it that the ruling has been properly preserved, designated as part of the record, and presented to the appellate court. If the appellant has failed to properly preserve the ruling which he claims as error, then the ruling is not subject to review. *State v. Lemon,* 251 Or 606, 447 P2d 394 (1968) ; *State v. Gill,* 3 Or App 488, 495-496, 474 P2d 23 (1970) ; *State v. Skrelunas,* 1 Or App 182, 185, 460 P2d 869 (1969).

---

[2] ORS 41.360 (15) provides a disputable presumption that: "Official duty has been regularly performed."

■■ A motion for new trial cannot be used as a substitute for a timely presentation of the claim of error to the trial court. After verdict, it is too late for the trial court to remedy whatever error may have occurred. Therefore, the denial of a motion for new trial based upon irregularities at trial does not of itself preserve an issue for appellate review. *State v. Thomson,* 203 Or 1, 16, 278 P2d 142 (1954).

In this case the claim of error was initially brought to the trial court's attention at about the time that the jury was sworn. The error, if any, could have been promptly remedied. *Cf. State v. Sands,* 2 Or App 575, 586, 469 P2d 795, *rev den* (1970), where voir dire was reopened. We cannot know here what ruling, if any, the trial court was asked to make or what curative action the court offered to take. We cannot determine whether error was committed and we will not presume it. If counsel feels the error to have been important at the time, rather than upon hindsight after an unsatisfactory verdict, it is not too great an obligation for him to assure that any protest to the court and the ruling thereon are properly preserved by seeing that the reporter is present and functioning. That was not done in this case.

Instead, counsel raised the issue approximately one month later at the hearing on the motion for new trial. The hearing gave opportunity for counsel and the trial court to express their memories of what had occurred, but does not substitute for an accurate record. Their representations do not necessarily imply that the trial court erred. Rather, it appears that the court acted properly during the second jury selection but that defense counsel suffered a momentary lapse of understanding, such as those to which lawyers are

occasionally subject in the course of litigation,[3] or, as his affidavit alleges, he simply did not hear.[4]

---

[3] Defense counsel asserted upon oral argument that he believed himself to be entitled to 12 rather than six peremptory challenges in part because the mistrial during the first jury selection had occurred "after I had exercised ten or eleven peremptory challenges." In fact, the transcript indicates that the trial court declared a mistrial after defense counsel had exercised only two peremptory challenges. A transcript is all the more valuable in light of the tendency of the memory to warp to one's own advantage with the passage of time from the event.

[4] The entire discussion of the point was as follows:

"MR. SUSAK [defense counsel]: Your Honor, the defendant filed a motion for a new trial based on irregularities in the proceedings of the Court, in that prior to starting the trial originally your Honor indicated to myself and Mr. Youngman that due to the seriousness of this charge there would be no exceptions taken to the jurors and we started on that basis. There was a mistrial declared on that first day. The second day the trial started and was operating—the trial started the following day, being this jury that returned this verdict in this case. I was operating under the assumption that the rules we had established with respect to picking the jury that first day existing with respect to the jury on this particular case and I was operating under the assumption that I had the number of challenges that your Honor had so indicated that prior day. At the conclusion of exhausting six challenges your Honor asked that the jury be sworn and at that time I spoke with your Honor in chambers and I cannot recall if we were on the record. However, I indicated to you at that time that I felt I had six further challenges and your Honor indicated to me that before the start of the trial you had stated that there would be only six challenges, I believe. Unfortunately, I did not hear that statement and for that reason I was not satisfied with the jury and I was not given an opportunity to excuse jurors seven through twelve, some of whom I had marked off on my pad as being unacceptable to the defense. That is reason number one, and the reason why I filed the motion based on irregularities in the proceedings of the Court.

"THE COURT: All right. Now, before you move on to number two, I'm sorry, Mr. Susak, if I did state—I think we did discuss the first day of trial, which resulted in a mistrial, I think we discussed in chambers the number of challenges and I think I was under the impression then that this was a capital offense and that the sentence would be life imprison-

■ The recollections of the court and counsel demonstrate regularity at least as well as they suggest irregularity. Such a record is insufficient to overcome

ment, and I indicated that in view of the peremptories, twelve for you and six for the District Attorney, I think—

"MR. SUSAK [defense counsel]: That's correct, your Honor.

"THE COURT: I think I indicated that when we were discussing the time elements and so forth and how much time we were going to have. I'm sure I did, and I was wrong. However, I do recall, and I'm sure the record will reflect that I corrected myself later because I checked the statutes. I don't think, like you said, I made a rule. I can't make a rule in contravention to the statute. I will accept the responsibility that I thought it was twelve originally, but I think I indicated prior to your voir dire the following day that again I think in discussing the time elements and so forth, I said that there would be six and three because the maximum sentence was twenty years.

"Do you recall that, Mr. District Attorney?

"MR. YOUNGMAN [prosecutor]: Your Honor, I don't know whether the record would show that. You made your point clearly the second day that there would be six and three. I don't know whether you did that on the record, but you did do it in chambers and I was present and I did hear you say that the rule of six and three would apply.

"THE COURT: All right. Well, I'm sorry, as I said, but even if I did and I hadn't corrected it, I still think you are bound as an officer of the Court to know the law, and if I misquoted the law and you relied upon my impression of it at that time, I would think that at least I'm not gifted with the talent of knowing every procedural statute or civil code, for that matter.

"MR. SUSAK [defense counsel]: Well, your Honor, as an officer of the Court I would take responsibility for knowing the law and knowing that in an armed robbery case, under the present code, there are only six challenges. However, I have tried armed robbery cases in the past where judges have within their discretion indicated that due to the seriousness of the case, if the District Attorney had no objections, they would allow the additional challenges, twelve challenges.

"THE COURT: I have never had that experience, and I'm not being critical at all because you didn't know what the statute said. I'm just saying I'm sorry, but I don't think the

the presumption of official regularity and the well-established allocation of responsibility to the appellant to present and preserve his claim of error. This assignment of error gives no cause to disturb the judgment.

■ Defendant next complains that the prosecutor was allowed to ask a defense witness the names of the crimes of which she had been convicted and the time and place of conviction. Allowance of such questions and answers was proper. *State v. Gardner,* 16 Or App 464, 518 P2d 1341 (1974).

The next two assignments of error deal with problems presented by the testimony for the state of John Costello, a co-defendant, who was at the time of trial confined under treatment at the Oregon State Hospital for mental illness.

The trial court handled a delicate and complex trial problem with a careful regard for all appropriate legal considerations. While its explanations were not always crystalline models of extemporaneous articulation, it is clear that discretion was exercised with the good sense of a trial judge who was close to the action and that we, as an appellate court, should not second-guess from the distance except for compelling considerations.

---

matters we are discussing warrant a new trial under the circumstances, as I recall it.

"MR. SUSAK [defense counsel]: I would ask, so that the record is clear, I would ask your Honor in case it's not on the record, as I do not recall if the court reporter was present, but does your Honor remember me objecting to not having the additional six challenges?

"THE COURT: You certainly did, either by word or deed. Frankly, you were quite surprised when I asked the clerk to swear the jury."

Appellant assigns two rulings as error: (1) the trial court's determination of the competency of John Costello to testify as a witness, and (2) the trial court's disallowance of a cross-examination question offered purportedly to demonstrate Costello's mental condition.

As to the first issue, it is well established that the competency of a witness to testify must be determined by the trial court and that determination will not be set aside on appeal except for abuse of discretion. *State v. Pace,* 187 Or 498, 212 P2d 755 (1949); *State v. Stich,* 5 Or App 511, 484 P2d 861 (1971). Where, as here, there is reason to doubt the competency of the proffered witness, a voir dire hearing is properly held. The standard to be applied at such a hearing is that found in ORS 44.020 which provides in pertinent part:

"All persons, except as provided in ORS 44.030, who, having organs of sense can perceive, and perceiving can make known their perceptions to others, may be witnesses. * * *"

Also, ORS 44.030 provides in pertinent part:

"The following persons are not competent witnesses:

"(1) Those of unsound mind at the time of their production for examination.

"* * * * *."

Mental defect is not of itself a disqualification of the witness. A developmentally disabled person, for example, may have limited intelligence and awareness of the world around him, but may nevertheless be able to perceive and recall with great accuracy events which affect his life. Similarly, one suffering from mental illness may nevertheless be able to perceive, remember and relate if that illness is not of a variety

or degree which affects those abilities. Therefore, it is only those mental defects which interfere with the ability to perceive and relate as required by ORS 44.020 that disqualify a witness on general competency grounds or for being of "unsound mind" as provided in ORS 44.030 (1).

The trial court made a careful preliminary inquiry into the witness' mental state prior to ruling him testimonially competent. Dr. Edward M. Colbach, a psychiatrist, was called as a court's witness. Dr. Colbach examined Costello. His questions, e.g., "Know who the President is now?," were of a testing nature rather than testimonial. The examination related to Costello's orientation, intelligence, power of abstraction, and ability to recollect data furnished to him during the questioning. Based upon his in-court examination, Dr. Colbach advised the court that in his opinion the witness was not competent to testify at a trial.

The court also called Dr. Wesley Weissert, Costello's treating psychiatrist at the Oregon State Hospital. He testified that Costello had hallucinations in the past involving the voices of his deceased father and brother telling him to kill himself. He had related visions of an armed person trying to kill him. Upon attempting to commit suicide at Rocky Butte Jail, he was transferred to the Oregon State Hospital. Dr. Weissert testified:

> "I think that he's competent to relate the events pertaining to this burglary. He has a lot of deficits, as has been pointed out in front of us, as to his intellectual capabilities, but he can relate in a logical sequence the facts that happened to him during his lifetime, and part of his memory deficit, I think is related to the treatment that he has had at the hospital. He was very, very ill when he came in and

he didn't respond to medication, so that we gave him a few electroshock treatments, and one of the side effects that usually is very self-limiting following this, and I think that his memory is sufficiently returned and I think that he can remember well enough events that have happened in his life, that I would consider him to be competent."

He further testified that Costello is given tranquilizers to prevent hallucinations which would have no effect whatever upon his testimony. Costello had testified in response to Dr. Colbach's questions that he had not had an hallucination since leaving Rocky Butte Jail. Dr. Weissert also stated that Costello "is still sick, but I don't think this is the main concern or factor in whether he can testify or is competent. I think he's still mentally ill."

■ In addition, the court questioned Costello, particularly as to motivation, and, unlike the reviewing court, observed the witness. The record demonstrates a witness who was illiterate and non-verbal, although reasonably able to function with numbers. He appeared to have limited intelligence, but that does not disqualify a witness. As the Supreme Court stated in *State v. Canton,* 76 Or 51, 57, 147 P 927 (1915):

"* * * That he is weak-minded appears from a perusal of his testimony, but this intellectual condition is not the 'unsoundness of mind' which is meant by the statute. * * *"

While Costello had memory deficits, they did not appear to be related to the events regarding which he was called to testify. There is no indication that his hallucinations existed at the time of the crime, that they related in any way to the events or personages of the crime, or that they continued to affect Costello at the time he was required to function as a witness.

Therefore, as Wigmore puts the rule, they do not interfere with his testimonial capacity in this case:

> "* * * [T]he inquiry is always as to the relation of the derangement or defect to the *subject to be testified about*. If on this subject no aberration appears, the person is acceptable, however untrustworthy on other subjects * * *." (original emphasis). 2 Wigmore, Evidence 586, § 492 (3d ed 1940).

■ We are satisfied that the trial judge properly measured the evidence against the standards of perception and communication set forth in ORS 44.020 and, particularly in view of the preference toward allowing the jury to be the ultimate judges of the quality of evidence,[9] it is clear that the trial court acted lawfully and discreetly.

Having approved of the manner in which the judge conducted the function of the court, we now turn to the propriety of the manner in which he allowed

---

[9] Wigmore favors the exercise of discretion in favor of allowing testimony. We need not go so far in this case:

"The tendency of modern times is to abandon all attempts to distinguish between incapacity which affects only the degree of credibility and incapacity which excludes the witness entirely. The whole question is one of degree only, and the attempt to measure degrees and to define that point at which total incredibility ceases and credibility begins is an attempt to discover the intangible. The subject is not one which deserves to be brought within the realm of legal principle, and it is profitless to pretend to make it so. Here is a person on the stand; perhaps he is a total imbecile, in manner, but perhaps, also, there will be a gleam of sense here and there in his story. The jury had better be given the opportunity of disregarding the evident nonsense and of accepting such sense as may appear. There is usually abundant evidence ready at hand to discredit him when he is truly an imbecile or suffers under a dangerous delusion. It is simpler and safer to let the jury perform the process of measuring the impeached testimony and of sifting out whatever traces of truth may seem to be contained in it. * * *" (footnote omitted.) 2 Wigmore, Evidence 594, § 501 (3d ed 1940).

the jury to perform its function. The trial court generalized that it would allow limited inquiry into the witness' mental condition, but would not allow the inquiry to go far afield.

Prior to the calling of the witness, the trial court advised defense counsel:

"THE COURT: You might give some thought before we resume this afternoon, I think the other day I told you I wouldn't permit you to ask where he's [Costello] been the last couple months, down at the hospital, but on reflection, I think you may have a right to * * * so I think you may have a right to go into where he's been and let the jury weigh the entire matter that he's being treated down there for problems. I don't know, but you think about it and see if you find a little law on it.

"MR. SUSAK [defense counsel]: I will."

The trial court alerted the jury that there were special problems in regard to Costello's testimony. Upon the calling of Costello as a witness, the court advised them as follows:

"Now, members of the jury, before this witness testifies, I'm going to advise you that this witness is the John Costello that you've been hearing about in this trial up to this stage, and I'm going to further advise you that Mr. Costello was sent to the Oregon State Hospital by me when I was Chief Criminal Judge about two months ago for treatment for emotional condition. Now, after our recess this morning, we had a hearing as prescribed by law, at which time I made a ruling and adjudged him competent to testify in this trial, but I want you to know where he's been and for what reasons. And by said ruling, of course, that permits him to testify and of course, how much weight you want to give this man's testimony is entirely up to you, like it would be with any other witness. But as a matter

of law, I have ruled that he's legally competent to testify."

The question asked and the sustained objection which found the second ruling assigned as error on appeal occurred during cross-examination:

"Q Mr. Costello, you've indicated that you have a good memory. Can you remember who the President of the United States is?

"A No.

"THE COURT: Just a minute. We went through that this afternoon. Go ahead, for the record.

"MR. YOUNGMAN: I object to that as being irrelevant.

"THE COURT: The objection is sustained, and I don't want you to go through any questions we discussed at this hearing this morning when I had to rule on the ability of this witness, whether he was competent or not to testify.
"* * * * *

"THE COURT: All right. I'm going to permit you to ask him, if its relevant to this case, but you're not going to go into questions to test him upon his ability to testify because I've already ruled on that. It's up to the jury to weigh his testimony.
"* * * * *

"THE COURT: Now before we proceed any further, Mr. Susak, I want to clarify my ruling a while ago when I said I'm not going to let you go into matters we covered such as does he know who the President is. If you want to ask any questions relevant to the incident or the alleged robberies, that might test his memory that night, that's fine, but on the matters that aren't relevant as to what happened that night, as I indicated, I'm directing you not to —

"MR. SUSAK: All right.

"THE COURT: — ask him."

The question regarding the identity of the president was one among the many questions asked of the witness by Dr. Colbach during the *in camera* psychiatric examination. Counsel confirmed on appeal that it was his intention to continue asking the same questions as Dr Colbach had asked during the examination.⊚

■■ Great latitude should be given to the cross-examiner to test the memory and competency of the witness, but there are bounds to that latitude. While the drawing of the bounds is largely within the discretion of the trial judge, the considerations are different for attacks upon veracity or credibility, and attacks upon competency or memory, *see* McCormick, Evidence 93, § 45 (Hornbook series 1972), and we are here concerned only with the latter. An attack upon competency does not allow an unlimited inquiry into the mental history and condition of a witness. Such a general psychiatric or psychological inquiry would shed more confusion than light. Only those mental limitations which would affect perception and recall

---

⊚ The only other cross-examination relating to Costello's mental condition was as follows:

"Q Where are you presently residing?
"A Salem.
"Q What is your address?
"A I don't know what the address is there.
"Q What is the name of the institution?
"A It's a hospital.
"Q What is it called?
"A I don't know what it's called.
"Q Isn't it the Oregon State Mental Institution?
"A Yes.
"MR. SUSAK: Thank you. I have nothing further."

Meaning no disparagement of counsel, it is significant that the witness' recollection of the name of the Oregon State Hospital, while faulty, was at least as accurate as that of his questioner.

are permissible in an attack upon the memory and recall of the witness. As stated in 2 Wigmore, Evidence, § 932:

> "The existence of a derangement of the sort termed insanity is admissible to discredit, provided that it affected the witness at the time of the affair testified to, or while on the stand or in the meantime so as to cripple his powers of recollection."

The precise issue in this case, then, is whether the trial court precluded cross-examination dealing with mental limitations or treatment which relate to the ability of the witness to perceive, remember and relate the facts of the crime. *Cf. State v. Goodin*, 8 Or App 15, 30, 492 P2d 287, *rev den* (1972). Such questions as Dr. Colbach asked and counsel desired to ask, while doubtlessly helpful psychiatric tools, do not appear to relate to the ability of the witness to recollect events in his life. For example, while Dr. Colbach demonstrated that Costello had difficulty reciting four digits in reverse order and remembering a street address which the examiner told him, Costello as a witness appeared to have a command of event-related numbers which appeared to be unaffected by mental limitations. Regarding the event in question, he testified:

> "Q (By Mr. Youngman [the prosecutor]) : Mr. Costello, were there any guns involved?
> "A Yes.
>
> "Q What were those guns?
> "A A .45, a 30.06, and .22.
>
> "Q Will you tell the jury who had which gun?
> "A Danny Longoria had the .45, I had the 30.06, and Jimmy Longoria had the .22."

 In a proper case, where there is indication that a witness suffers mental impairment affecting his testimonial capability, it may be proper to allow psy-

chiatric or psychological evidence to assist the jury in assessing the ability of that witness to perceive, remember and relate.[7] We need not so decide in this case because none was offered. A cross-examiner, however, should not be allowed to attempt to emulate a psychiatric examination before the jury, as defense counsel did here, any more than counsel should attempt to emulate a cardiological, neurological or proctological examination in open court. There is no assurance that the examination will be competently performed by the lawyer[8] and the spectacle looms of alternating evidence with one lawyer showing that the witness cannot recite digits backwards and adverse counsel showing that the witness can remember them forwards, and then both going on to other tests. Such a procedure would have no discernible tendency to assist the jury. The court properly restricted cross-examination to those questions which reflected on the witness' ability to remember the events of the night in question and defense counsel availed himself fully of the opportunity for accepted forms of cross-examination.

The cross-examiner is entitled to ask any witness questions relating to past or present mental condition or treatment which common experience or expert testimony shows to be related specifically to the ability to so testify. We need not draw the perimeter of

---

[7] But, cf. *State v. Calia,* 15 Or App 110, 514 P2d 1354, *rev den* (1974). The Supreme Court has, however, considered the admissibility of psychiatric evidence relating to veracity. *State v. Walgraeve,* 243 Or 328, 412 P2d 23, 413 P2d 609 (1966).

[8] E.g., Dr. Colbach asked Costello whether he knows who the president is, a question which measured awareness, while counsel asked Costello if he remembered who the president is, a question which incorrectly assumes awareness. Many ill and retarded people are unaware of the identity of the president, yet can accurately perceive and relate events of their lives.

permissibility of such evidence in this case, however, because there was no offer of proof to demonstrate that the question in issue was related to the ability of the witness to perceive, remember and relate the facts in issue. Furthermore, the defendant made no offer of proof as to what further questions he wished to ask and what answers would be received. Therefore, we have no way of determining whether the exclusion of the evidence was prejudicial. *State v. Walker,* 5 Or App 47, 478 P2d 643 (1971); *State v. Jenkins,* 246 Or 280, 424 P2d 894 (1967); *Jones v. Mitchell Bros.,* 266 Or 513, 511 P2d 347 (1973). The failure to make an offer of proof is particularly significant in view of the court's early instruction to counsel that he was open to argument as to the extent of cross-examination regarding Costello's mental condition. No error was committed.

The defendant also assigns as error the denial of a motion for mistrial and of his motion for a new trial as it related to purported newly discovered evidence. We have reviewed the record fully and find no error to have been committed. However, discussion on these pages would not be useful to the bench and bar in the conduct of subsequent cases.

Affirmed.

SCHWAB, C. J., specially concurring.

Under the particular circumstances of this case I believe the trial court was too restrictive in the scope of cross-examination it indicated it would allow with regard to the witness Costello. Nevertheless, I am satisfied there was substantial evidence of defendant's guilt independent of the witness Costello, and therefore agree that we should not consider the matter in the

absence of an offer of proof. The only question asked and answered was of no substance and nothing indicates that defendant's counsel would have been more effective had he continued by way of an offer of proof.

FORT, J., dissenting.

Defendant was convicted by a jury on four counts of robbery in the first degree. The offenses were committed in the early morning hours by at least three armed men, wearing stocking masks. The trial commenced on April 4, 1973. On that day, just prior to its commencement, the state informed the defendant that John Costello, an alleged accomplice of defendant in the commission of the crime, would testify for the state. Until that time the state had consistently informed the defendant that Costello was in a mental institution, was incompetent and would be unable to testify.

The court held a hearing in the absence of the jury during the trial to consider whether Costello, who on that day was brought to court from the state mental hospital, was competent. A major portion of the testimony related to his capacity to remember. Two psychiatrists were called. One said he was competent to testify, and the other said he was not. The court ruled he was competent to testify. He was then called as a witness by the state, having first been granted immunity from prosecution.

During cross-examination of Mr. Costello, the following transpired:

"Q. [by defense counsel] Do you have a fairly good memory, Mr. Costello?

"A. Yes.

"* * * * *

"Q. Mr. Costello, you've indicated that you have a good memory. Can you remember who the President of the United States is?

"A. No.

"THE COURT: Just a minute. We went through that this afternoon. Go ahead, for the record.

"MR. YOUNGMAN [deputy district attorney]: I object to that as being irrelevant.

"THE COURT: The objection is sustained, and I don't want you to go through any questions we discussed at this hearing this morning when I had to rule on the ability of this witness, whether he was competent or not to testify.

"Q. (By Mr. Susak) Mr. Costello, do you know a gentleman by the name of Max Sagner?

"A. Yes.

"Q. Why don't you describe Mr. Sagner for me, please?

"MR. YOUNGMAN: I object to that as well, unless counsel can tie that up as to its relevance.

"THE COURT: Are you representing it's relevant to this case?

"MR. SUSAK: Yes, Your Honor.

"THE COURT: All right. I'm going to permit you to ask him, if it's relevant to this case, but you're not going to go into questions to test him upon his ability to testify because I've already ruled on that. It's up to the jury to weigh his testimony.

"* * * * *

"THE COURT: Now before we proceed any further, Mr. Susak, I want to clarify my ruling a while ago when I said I'm not going to let you go into matters we covered such as does he know who the President is. If you want to ask any questions relevant to the incident or the alleged robberies, that might test his memory that night, that's fine,

but on the matters that aren't relevant as to what happened that night, as I indicated, I'm directing you not to — * * * — ask him."

3 Wharton, Criminal Evidence 266-67, § 871 (Anderson 1955) states:

"Cross-examination to impeach, diminish, or impair the credit of the witness is not confined to matters brought out on the direct examination. The witness may be cross-examined as to collateral matters not embraced in the direct examination to test credibility and veracity.

"Any question is allowed which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility. Great latitude is allowed in cross-examination upon matters bearing upon the witness' credibility. Any cross-examination which permits an insight into the credibility of the witness is permissible. Inasmuch as the jurors are the sole judges of the credibility of the witness, any matter that will properly assist the jurors in forming a correct judgment from all the facts ought to be shown in evidence. * * *"

McCormick, Evidence 93, § 45 (hornbook series 1972) points out the distinctions between attacks on competency and credibility as follows:

"As to the mental qualities of intelligence and memory, a distinction must be made between attacks on competency and attacks on credibility, the subject of this section. Sanity in any general sense is not the test of competency, and a so-called insane person may testify if he is able to report correctly the matters to which he testifies and if he understands the duty to speak the truth. Manifestly, however, the fact of mental 'abnormality' either at the time of observing the facts or at the time of testifying will be provable, on cross or by extrinsic evidence, as bearing on credibility. * * *"

In *State v. Miskell,* 161 NW2d 732, 735 (Iowa 1968), the court said:

"58 Am. Jur., Witnesses, section 699, pages 378, 379, states: 'A person without memory is valueless, if not incompetent, as a witness. Hence, any evidence going to show that the mind and memory of the witness are impaired by disease or otherwise, and are in a feeble condition, is competent to discredit his testimony. This is permissible even though the witness may not be mentally incompetent to testify.' For like statements see 98 C.J.S. Witnesses §§ 461 (f), 486, and 3 Wigmore, 3rd Ed., section 931.

"Testimony is admissible to impeach a witness by showing his mind and memory have become inpaired [sic] and in an abnormal condition. State v. Alberts, 199 Iowa 815, 818, 819, 202 N.W. 519, 521; Alleman v. Stepp, 52 Iowa 626, 629, 3 N.W. 636, 637. Such evidence is admissible on cross-examination of the witness. [Citations omitted.]"

In *Walley v. State,* 240 Miss 136, 126 So2d 534, 535 (1961), the court said:

"* * * We think the case must be reversed for the exclusion of certain evidence proffered by defendant's counsel in his cross-examination of Ellis, the State's chief witness. The defense has a right on cross-examination to interrogate the State's witnesses concerning their mental capacity, perception, memory and trustworthiness. These were especially important issues as to Ellis. On cross-examination of him, counsel asked Ellis whether he was confined in a mental hospital in San Antonio, Texas two years ago. The district attorney's objection to this question was sustained. It should have been overruled. Whether Ellis has a history of previous mental disorders was a relevant fact for the jury to consider in determining his veracity."

In *Ellarson v. Ellarson,* 198 App Div 103, 190 NYS 6, 9 (1921), the court said:

> "Having passed the examination by the court and been sworn, the mental capacity of the witness may be tested and considered as bearing upon her credibility and her degree of intelligence. In Wigmore on Evidence, vol. 2, § 932, it is said:
>
>> " 'The existence of a derangement of the sort termed insanity is admissible to discredit, provided that it affected the witness at the time of the affair testified to, or while on the stand or in the meantime so as to cripple his powers of recollection.' "

*See also: Sturdevant v. State,* 49 Wis 2d 142, 181 NW2d 523, 526, 44 ALR 3d 1196 (1971); 98 CJS 326, Witnesses, § 461.

In its brief the state acknowledges "[i]t may, indeed, be questioned whether the court's ruling on this matter was entirely correct. * * *[I]t is at least arguable that some general questions concerning a witness' memory and mental condition are permissible on cross-examination, for their bearing on the witness' credibility." But, it contends, "the rulings complained of in this assignment of error [do not] warrant reversal." I disagree.

The psychiatrist who testified he considered Mr. Costello competent to testify said:

> "I think that he's competent to relate the events pertaining to this burglary. He has a lot of deficits, as has been pointed out in front of us, as to his intellectual capabilities, but he can relate in a logical sequence the facts that happened to him during his lifetime, and part of his memory deficit, I think, is related to the treatment that he has had at the hospital. He was very, very ill when he came in and he didn't respond to medication, so that we gave

him a few electroshock treatments, and one of the side effects that usually is very self-limiting following this, and I think that his memory is sufficiently returned and I think that he can remember well enough events that have happened in his life, that I would consider him to be competent."

He also testified:

"He gets medication every night. He's getting some major tranquilizers, Thorazine and Stelazine, and as he told you, he takes it at nighttime and this is hopefully to prevent these hallucinations that he has had frequently in the past. He is still sick, but I don't think this is the main concern or factor in whether he can testify or is competent. I think he's still mentally ill.

"THE COURT: Has he ever told you about any threats on his life in your interviews?

"THE WITNESS: I think most of his hallucinations are persecutory. It's the voices of his father and his brother, who I think are both dead, that keep telling him to kill himself. 'It's your turn, we're going to get you.' And this is the thing I think that makes him so frightened and he has visions in his cell, or he did formerly, of somebody there that's obviously got a weapon and trying to kill him. These are the things that have been causing him to be suicidal. I think he's trying to escape these things."

The other psychiatrist did not think Mr. Costello was mentally competent to be a witness at all.

Clearly then, his credibility as a witness was a significant issue both with respect to his capacity to remember and the degree of his current derangement. The court's second ruling, supra, made on its own motion limiting the cross-examination "to the incident of the alleged robberies, that might test his memory that night, that's fine, but on the matters that aren't

relevant as to what happened that night, as I indicated, I'm directing you not to * * * ask him" foreclosed the defendant from relevant cross-examination to test Mr. Costello's credibility. As such, it was clearly prejudicial. I would reverse.

I therefore do not agree with the conclusion that defendant here is barred because he did not make an offer of proof concerning the nature and extent of Costello's current derangement. The nature and extent of that testimony was clearly known to the court from the hearing just previously held by it in the absence of the jury concerning Costello's competency to testify as a witness. It is obvious from the record set forth above that such an offer would have served no purpose.

Accordingly, I respectfully dissent.